## THE MAMIE & FRANK.

## THE PERTH AMBOY NO. 3.

## THE CHARLES A. OWEN.

District Court, S. D. New York.
Feb. 23, 1933.

Purdy & Purdy, of New York City (John E. Purdy, of New York City, of counsel), for libelant.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Crawley, of New York City, of counsel), for libelants Dittmar and Northwestern Fire & Marine Ins. Co.

Park, Lynch & Hagen, of New York City (Anthony V. Lynch, Jr., and Henry C. Eidenbach, both of New York City, of counsel), for claimant of The Perth Amboy, No. 3.

FRANK J. COLEMAN, District Judge.

The tow, which included the two damaged barges, the Mamie & Frank and the Charles A. Owen, went adrift while temporarily moored at a Brooklyn dock, and the questions presented are whether this was due to the sole negligence of the tug Perth Amboy No. 3, which had them in charge, and whether there was negligence on the part of the barges or their owners in the failure to pre-vent the resultant damage by the use of anchors.

On November 27, 1928, the tug Perth Amboy No. 3 took a tow of seven loaded coal barges from Perth Amboy bound up the East River. On arriving at Brooklyn she moored the tow temporarily at the Rosin Dock at Dikeman street for the purpose of delivering one of the barges and of performing other towing services entirely unconnected with this tow. After an absence of five or six hours, she returned to Dikeman street and discovered that the tow had in the meantime gone adrift and had been carried by the tide up the Buttermilk Channel to Pier 22. The barges Mamie & Frank and the Charles A. Owen had been damaged by collision with that pier or perhaps another pier in the vicinity.

The tow was made up in three tiers, and at the time it went adrift had three barges abreast in the first, two in the second, and one in the third. The Charles A. Owen was on the starboard side in the first tier, and the Mamie & Frank directly behind it on the starboard side of the second tier. The boat in the third tier was directly behind the Mamie & Frank. The tow was moored at Dikeman street at about midnight, while the tide was running strong ebb between two and three miles an hour. Only two mooring lines were put out, both from the bow of the Charles A. Owen, one from the starboard corner and the other from the center bit. The tow was left angling out in the stream fastened only at its starboard bow corner, which was 10 or 12 feet from the spiles, with its port bow corner still further away from the spiles, and with its tail down stream at a distance of about 100 or 150 feet from the line of the dock.

While the structure to which the tow was moored has been designated as a "dock," it was really a row of separated spiles to some extent reinforced by fastenings to an inside row. Each of the mooring lines was put around two of the spiles, and what caused the tow to go adrift was the fact that the four spiles were pulled over by the weight of the tow so that the lines slipped over their tops without breaking.

Some time after midnight and before the return of the tug the tide changed, and it was at about that time that the spiles were pulled over and the tow went adrift. It is reasonable to infer that the swing of the tow with the change in the tide caused the dislocation of the spiles.

It seems to me that the tug was clearly negligent in leaving the tow in that condition over a change in the tide. While it is not unusual for tows to be left at Brooklyn docks while their tugs deliver barges from them and for the barge masters to make requisite changes in the mooring lines when a change of tide intervenes, such procedure places upon the bargees more responsibility than the management and care of their respective barges. If the tow is hanging on lines from one bow corner, a change in the tide would usually swing the other bow corner close to the dock, at which time new lines would be put out from it and the old lines slacked so as to permit the tail of the tow to angle in the opposite direction. Whether or not a tug is ordinarily justified in leaving this responsibility upon the bargees, in the present case it appears that the bargees were given no instruction as to what to do nor even told that the tug would be absent at the change in tide. Furthermore, it does not appear that these bargees could have accomplished such a change of lines because apparently the spiles gave way and the tow went adrift before the port bow corner was swung close enough to put out new lines. The tug chose this insecure mooring place because of a desire to yield a better location, Pier 39, to a larger tow. This courtesy may have been commendable, but the tug should have taken precautions against the increased danger by putting out additional lines or by returning at the change of the tide.

Aside from the failure to use anchors, the evidence discloses no negligence on the part of the libelants or their bargees. Certainly the master of the Mamie & Frank, which was in the second tier, was powerless to prevent the tow from going adrift. As to the master of the Charles A. Owen, his boat was 10 or 12 feet from the spiles and it does not appear that the other barges in the first tier approached any closer on the swing of the tide. Under these circumstances, it was impossible for any of them to get out additional mooring lines. A slacking of the lines without putting out new ones to sustain the strain would have been futile and might have added to the dangers.

No anchor was dropped from the tow while it drifted a distance of about one mile from Dikeman street to Pier 22. It does not accurately appear how long a period of time this occupied, but the rate of the current at its full strength was probably between two and three miles an hour. The bottom, for almost the entire distance was soft and suitable for anchoring except that there was a cable crossing between Governor's Island and Brooklyn, indicated on the chart as about one-quarter mile in width and so located that the tow traversed about half a mile before reaching it and about one-quarter mile after passing it.

Neither of the two damaged barges was equipped with an anchor, nor was any other boat in the tow except the port boat in the first tier. While this was negligence on the part of the owners, the tug cannot be relieved of any of its liability unless it has affirmatively proved that a reasonably diligent use of an anchor would have prevented the damage. Neither of these libelants can be held responsible for the negligence of the other barge owners.

Upon this record I am not convinced that a single anchor would have held the six loaded barges in that tideway; but even if it would, I am not convinced that a man of ordinary diligence in the position of these bargees would have used it properly. They had no way of determining accurately the location of the cable crossing, more particularly as the matter occurred at night. Where there was such flagrant negligence on the part of the tug, the court should not strain to relieve it in a situation where so much doubt remains as to the proper and effective use of an anchor. Settle decrees on notice.